IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

UNITED STATES OF AMERICA,    )
                             )
                  Plaintiff, )
                             )
    vs.                      )
                             )
DANIEL STANG,                )
                             )   No. 3:13-cv-0190-HRH
                  Defendant. )
_____)

O R D E R

Motion for Summary Judgment; Motion to Dismiss

Plaintiff United States moves for summary judgment pursuant to Rule 56, Federal Rules of Civil Procedure.[1] The motion is opposed.[2] Plaintiff has replied.[3] The United States moves to dismiss defendant's counterclaim for lack of jurisdiction.[4] The motion to dismiss is opposed,[5] and plaintiff has replied.[6]

Plaintiff, as trustee for Karen Dickson-Bahnke, contends that defendant Daniel Stang is trespassing upon a Native allotment which Ms. Bahnke inherited from her father, Steve Dickson.[7] Dr. Stang opposes the motion for summary judgment, contending that Dickson abandoned his claim as to a portion of the Native allotment, and that he (Dr. Stang) was

---

[1]Docket No. 22.

[2]Docket No. 34.

[3]Docket No. 47.

[4]Docket No. 49.

[5]Docket No. 54.

[6]Docket No. 59.

[7]"Stephen Dickson" in some of the relevant documents.

Order – Motion for Summary Judgment; Motion to Dismiss         - 1 -

entitled to notice of the survey and of the adjudication made with respect to the Dickson Native allotment application. In his counterclaim, Dr. Stang contends that the failure to notify him of the Dickson Native allotment proceedings constituted a violation of the Due Process Clause of the United States Constitution.

Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The initial burden is on the moving party to show that there is an absence of genuine issues of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). If the moving party meets its initial burden, then the non-moving party must set forth specific facts showing that there is a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). In deciding a motion for summary judgment, the court views the evidence of the non-movant in the light most favorable to that party, and all justifiable inferences are also to be drawn in its favor. Id. at 255. "[T]he court's ultimate inquiry is to determine whether the 'specific facts' set forth by the non-moving party, coupled with undisputed background or contextual facts, are such that a rational or reasonable jury might return a verdict in its favor based on that evidence." T.W. Elec. Service, Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 631 (9th Cir. 1987).

The facts material to this case, including a lengthy narrative affidavit by Dr. Stang,[8] are not in dispute. On the undisputed facts set out below, plaintiff is entitled to judgment as a matter of law; and plaintiff is entitled to judgment dismissing Dr. Stang's counterclaim for lack of jurisdiction.

## Undisputed Facts

In the mid-1970s, Dr. Stang, his colleague Ray Lang, Steve Dickson, and Jack Titus discussed doctors Stang and Lang acquiring a lot in Council, Alaska, from the Council Native Corporation. Mr. Titus believed that he could, as a shareholder of the corporation,

---

[8]Docket No. 35.

obtain a lot adjacent to his (Titus') brother's homesite and Steve Dickson's homesite. Jack Titus was willing to exchange that lot for dental work, a snow machine, and some other personal property. On March 11, 1976, Jack Titus executed a quitclaim deed in favor of doctors Dan Stang and Ray Lang.[9] There is no evidence that this deed was ever recorded. Steve Dickson became concerned when Titus did not receive title to the property which Dickson and Lang were occupying.[10] Steve Dickson decided to proceed with a Native allotment application for the property in question.

Steve Dickson filed Application No. F-1050 with the Bureau of Land Management on September 13, 1971.[11] On November 14, 1990, the Bureau of Land Management determined that the Dickson allotment had been legislatively approved.[12] The Bureau of Land Management, Alaska State Office, issued a decision on the Dickson Native allotment application in favor of Mr. Dickson on November 14, 1990. The decision described two parcels:

> Lot 1, U.S. Survey No. 8877, Alaska, situated on the left bank of the Niukluk River at the village of Council, Alaska.

and

> Lot 1, U.S. Survey No. 8979, Alaska, situated on the southerly edge of an unnamed road in the village of Council, Alaska.[13]

---

[9]Docket No. 34-1. That deed referred to the property in question as the sixth lot "from east to west between Main Street and cliff of river." The court understands that the Dickson Native allotment application and the foregoing quitclaim deed described the same or approximately the same property.

[10]Clerk's Docket No. 35, ¶ 22.

[11]Department of the Interior, Bureau of Land Management Decision, Docket No. 34-3 at 1: "[o]n June 13, 1968, and April 10, 1972, the Bureau of Indian Affairs (BIA) filed Native allotment application F-1050, Parcels A and B, respectively ... on behalf of Steve Dickson." On June 1, 1981, the State of Alaska protested Application No. F-1050 as to Parcel B.

[12]Id. at 2 of 5.

[13]Id. at 3 of 5.

The foregoing descriptions were based upon official surveys filed in December of 1986 and December of 1988, respectively.[14] The Bureau of Land Management issued its Certificate of Native Allotment in favor of Dickson as to the property in question on May 20, 1991.[15] The certificate provides that:

> the land above-described shall be deemed the homestead of the allottee and his heirs in perpetuity, and shall be inalienable and nontaxable until otherwise provided by Congress or until the Secretary of the Interior or his delegate, pursuant to the provisions of the [Native Allotment Act] of May 17, 1906, as amended, approves a deed of conveyance vesting in the purchaser a complete title to the land.[16]

Neither plaintiff nor Dr. Stang has any evidence that the Secretary or his delegate ever approved a conveyance of a portion of Lot 1, U.S.S. 8877, or Lot 1, U.S.S. 8979, to Dr. Stang.

Dr. Stang first took possession of a portion of the Dickson Native allotment in the spring of 1976 and commenced construction of a house.[17] Over the years, Dr. Stang constructed improvements on a portion of the Dickson allotment: a house in 1976, a garage and water well were placed on the property in 1980, and in 1984 a two-story 16' by 16' addition was added to the house.[18] A garage and barn were built in 1992; a generator building in 1989; a tack shed in 1989; a gas shed and solar array in 2011; and fuel storage tanks in 1992.[19] Dr. Stang was in possession of a portion of the Dickson allotment for approximately 35 years prior to the filing of plaintiff's complaint. He had improvements on the Native allotment when the two lots which make up the allotment were surveyed in 1986 and 1988.

---

[14] Complaint, Exhibit 2, Field Diagram A, Docket No. 1-2, a copy of which is appended to this order.

[15] Docket No. 23-1.

[16] Id.

[17] Second Affidavit of Daniel Stang at 3, ¶¶ 15, 16, and 17, Docket No. 35.

[18] Id., page 3, ¶ 17, and page 4, ¶ 23.

[19] Id., page 5, ¶ 28. These improvements may have been on property other than the Dickson allotment.

In November of 1986 – while the Dickson allotment application was pending but before it was approved – Dickson quitclaimed the west 115 feet of Lot 1, U.S.S. No. 8877, to Dr. Stang.[20] In paragraph 6 of plaintiff's complaint, it is alleged that the November 10, 1986, quitclaim deed "was recorded" and, in the same paragraph, that "it was not recorded."[21] Defendant's amended answer is equally equivocal, for defendant "admits the allegations of Paragraph 6 of plaintiff's complaint."[22] This conundrum is resolved by plaintiff's July 31, 2012, title status report which – under the heading "encumbrance notes (other)" – contains a notice of the existence of the November 10, 1986, quitclaim deed. Unlike other proceeding notices which were set out as "recorded" documents, there is no such information with respect to the November 10, 1986, quitclaim deed.[23] The court finds that the latter deed was never recorded.

The plaintiff's title status report[24] reflects the recording of two quitclaim deeds, one on May 8, 1989, and the other on October 22, 1998. The court requested and has been provided with copies of those deeds.[25] Neither are germane to a resolution of this case. The 1989 deed conveys a parcel of land across Council Road from the two subject lots. Some of the buildings that Dr. Stang constructed were on this parcel; but, again, the April 1989 deed conveys property other than that involved in this case. The 1998 deed does purport to convey the west 115 feet of Lot 1, U.S.S. 8877, from Dr. Stang's wife to Dr. Stang.

---

[20]Opposition to Motion for Summary Judgment, Quitclaim Deed, Docket No. 34-2. Dr. Stang believes, and it may be true, that Dickson intended that Stang take title to both the west 115 feet of Lot 1, U.S.S. 8877, <u>and</u> the west 115 feet of Lot 1, U.S.S. 8979. Neither party has produced a conveyance with respect to the west 115 feet of U.S.S. 8979; and the court finds that Dickson's probable intention was never documented.

[21]Complaint at 3, ¶ 6, Docket No. 1.

[22]Amended Answer and Counterclaim at 2, ¶ 6, Docket No. 16-1.

[23]Plaintiff's title status report, Docket No. 23-6.

[24]<u>Id.</u>

[25]Docket No. 61.

This conveyance appears to have been part of a divorce settlement, and in no respect affects the outcome of this case.

Steve Dickson died testate on February 18, 2007. Mr. Dickson's will was probated by the United States Department of the Interior, Office of Hearings and Appeals, Probate Hearings Division. A probate decision was issued April 29, 2010, vesting Steve Dickson's Native allotment land in his daughter, Karen Dickson-Bahnke.[26]

On June 29, 2012, a BIA contractor notified Dr. Stang that he was trespassing on Ms. Bahnke's Native allotment, F-1050(B), Lot 1, U.S.S. 8877, and Lot 1, U.S.S. 8979.[27] When a further notice of July 11, 2012,[28] produced no results, this action was commenced by plaintiff on October 1, 2013. The complaint, consisting of a single count, asserts that Ms. Bahnke has legal title to the property in question and that Dr. Stang has no legal title to the property which he has occupied.[29] In fact, and as reflected by plaintiff's title status report,[30] title to the Dickson allotment is held by the United States of America in trust for Ms. Bahnke. Appended to plaintiff's complaint is Field Diagram B of the two above-described U.S. Survey lots, showing the relative locations of numerous improvements that have been placed upon the two lots.[31] With reference to Field Diagram B and the affidavit of Dr. Stang, the "blue" buildings are the improvements that Dr. Stang placed upon the

---

[26] Memorandum in Support of Motion for Summary Judgment, Probate Decision, Docket No. 23-2.

[27] Id., Notice of Trespass (pages 1-2 of 4), Docket No. 23-4. This notice mistakenly makes reference to AS 11.46.350(b)(1), a criminal trespass statute. Plaintiff now recognizes that its action on behalf of Ms. Bahnke is pursuant to AS 09.45.630, actions for recovery of real property. Complaint at 4, ¶ 16, Docket No. 1.

[28] Id., Notice of Trespass (pages 3-4 of 4), Docket No. 23-4.

[29] Complaint at 4-5, Docket No. 1.

[30] United States' Memorandum in Support of Motion for Summary Judgment, Docket No. 23-6.

[31] Complaint, Exhibit 3, Field Diagram B, Docket No. 1-3, a copy of which is appended to this order.

Dickson allotment. Those improvements are located on approximately the westerly half (perhaps 115 feet) of both Lot 1, U.S.S. 8877, and Lot 1, U.S.S. 8979.

Decision

The General Allotment Act was extended to Alaska Natives in 1906. Ch. 2469, 34 Stat. 197. The Alaska Native Allotment Act was amended in 1956 to provide that: "[a]ny Indian, Aleut, or Eskimo who receives an allotment under this Act, or his heirs, is authorized to convey by deed, with the approval of the Secretary of the Interior, the title to the land so allotted...." Ch. 891, 70 Stat. 954. The Alaska Native Claims Settlement Act of 1971[32] repealed the authority of the Secretary to authorize Native allotments in Alaska.[33] The Settlement Act further provided that: "[n]otwithstanding the foregoing provisions of this section, any application for an allotment that is pending before the Department of the Interior on December 18, 1971, may, at the option of the Native applicant, be approved and a patent issued in accordance with [the] 1906 Act...."[34] Subject to complex conditions not here relevant, the Alaska National Interest Lands Conservation Act directed the Secretary to approve then-pending Native allotment applications. The Native allotment issued to Steve Dickson May 20, 1991, was duly issued pursuant to the foregoing statutes.

The United States holds a legal estate in Lot 1, U.S.S. 8877, and Lot 1, U.S.S. 8979, and the United States' beneficiary, Karen Bahnke, is entitled to possession of that property by virtue of inheritance from her father, Steve Dickson. Accordingly, the United States is entitled to bring an action to recover possession and damages on account of Dr. Stang's presence on the property. AS 09.45.630.[35]

---

[32] 85 Stat. 688, 43 U.S.C. §§ 1601-1629.

[33] 43 U.S.C. § 1617(a).

[34] Id.

[35] AS 09.45.630 provides: "[a] person who has a legal estate in real property and has a present right to possession of the property may bring an action to recover the possession of the property with damages for withholding it...."

Dr. Daniel Stang owns no right, title, or interest in the above two lots. Neither Dr. Stang nor Dr. Lang obtained any title to the Dickson allotment lands by virtue of Jack Titus Jr.'s quitclaim deed of March 11, 1976, because Mr. Titus had never obtained title to the property in question. The November 10, 1986, quitclaim deed from Dickson to Stang and his wife as to the west 115 feet of Lot 1, U.S.S. 8877, is invalid and conveys no right, title, or interest in that property to Dr. Stang for lack of approval of the quitclaim deed by the Secretary or his delegate.

There is no evidence that Dickson ever abandoned any portion of his Native allotment application. On the contrary, Dickson applied for and was granted a Native allotment and intended that Dr. Stang have title to a portion of his Native allotment. Dr. Stang's possession of portions of the Dickson Native allotment during Dickson's lifetime was permissive. However, and as a matter of law, title to the subject property was and remains in the United States of America, subject to the rights of Dickson and his devisee, Karen Bahnke, who became entitled to possession of the Native allotment under the terms of the Dickson will upon his demise, February 18, 2007.

In opposing plaintiff's motion for summary judgment, Dr. Stang argues, as pled in his counterclaim, that his due process rights have been violated. He contends that the United States was required to provide him with notice "of the survey that has become the basis of the complaint seeking to oust him from the property he has held under color of title for more than thirty five years."[36]

Dr. Stang's arguments are based on a faulty premise: that he had some protectable interest in the Native allotment. On November 10, 1986, the date of the Dickson-to-Stang quitclaim deed, and thereafter, Dr. Stang had no right, title, or interest in the land which ultimately became the Dickson Native allotment. When Dickson did acquire an interest in that property – by virtue of the certificate of his allotment – legal title to the allotment

---

[36]Docket No. 16-1 at 6, ¶ 20.

remained in the United States subject to Dickson's allotment rights; which rights Dickson was powerless to convey to anyone without the approval of the Secretary of the Interior or his delegate. Thus there is no substantive due process violation here, for Dr. Stang has been deprived of no property right. But what about procedural due process?

It is of course true that Dr. Stang's improvements on what was to become the Dickson Native allotment were in plain sight and must have been seen by those who surveyed the Native allotment, but there is no evidence that the surveyors or anyone else knew that the buildings that Dr. Stang had placed upon the property had been placed there by someone other than the allotment applicant. The Titus quitclaim deed to Drs. Stang and Lang preceded both the 1986 and 1988 surveys. The Dickson quitclaim deed preceded the 1986 and 1988 surveys but, because that deed was never recorded, there was no way the surveyors would know that anyone but Dickson was interested in the property. Thus there is no procedural due process violation here, for Dr. Stang has not demonstrated that those processing Dickson's Native allotment had any knowledge that Dr. Stang might claim an interest in the allotment property. In fact, Dr. Stang had no legal interest in the property.

In theory, Dr. Stang might have protested the approval of the Dickson allotment, but it is clear that both Dickson and Dr. Stang intended that the Dickson allotment application be granted because they believed – mistakenly – that Dickson's quitclaim deed would give Dr. Stang title to part of the allotment. Likely, Dr. Stang had no knowledge of the details of the allotment proceedings; but, once again, there is no evidence that anyone processing the Dickson allotment application was ever put on notice that someone other than Steve Dickson might be interested in the subject land.

In moving to dismiss Dr. Stang's counterclaim, the United States argues that Dr. Stang is really claiming that Karen Bahnke does not own the property and that the gravamen of the counterclaim is a quiet title action. In opposing the plaintiff's motion to dismiss, defendant concedes that 28 U.S.C. § 2409a, Quiet Title Act, expressly provides that

the Act does not apply to trust or restricted lands such as that at issue here. Instead, defendant suggests that the agency decision to grant Dickson's Native allotment should nonetheless be subject to judicial review. But defendant's counterclaim is not one for judicial review of an administrative decision. As stated, defendant's counterclaim is one for a due process violation. As plaintiff points out, the United States has not waived sovereign immunity to be sued for constitutional violations. FDIC v. Meyer, 510 U.S. 471, 478 (1994). Either as a quiet title claim or as a constitutional claim, defendant's counterclaim against plaintiff fails.

Apparently recognizing that judicial review by way of the Administrative Procedure Act has neither been pled nor would it have been timely, Dr. Stang argues for a judicial review of a perceived equal protection issue. Dr. Stang's counterclaim does not assert any equal protection claim.

Dr. Stang endeavors to construct an equal protection claim on the basis of this court's lack of jurisdiction to entertain a quiet title action, while a Native American whose allotment application is rejected may obtain judicial review under 25 U.S.C. § 345. The comparison is inapposite. Title to the property in question has always been held by the United States of America. The United States has an absolute right to dispose of its property as it sees fit by virtue of Article IV, Section 3, Clause 2, of the United States Constitution. Congress has seen fit to extend the allotment process to Alaska, and granted a Native allotment to Dickson. The fact that Dickson might have sought judicial review under 25 U.S.C. § 345 had his allotment application been denied does not give rise to an equal protection claim on the part of Dr. Stang. Congress had the absolute right to restrict Native allotments to Native Alaskans, to limit review to disappointed Native allotment applicants, and to exclude others from bringing quiet title actions as to trust lands. There are no circumstances under which Dr. Stang could obtain a Native allotment, and because Dr. Stang had no interest in the property which became the Dickson Native allotment, the

circumstances of Dr. Stang and Dickson are entirely different. There would be no equal protection violation even if such a claim had been made in defendant's counterclaim.

Plaintiff's motion for summary judgment is granted. Plaintiff's motion to dismiss Dr. Stang's counterclaim for lack of jurisdiction is granted. The court concludes that Karen Bahnke is entitled to possession of the entirety of Lot 1, U.S.S. 8877, and Lot 1, U.S.S. 8979. The court concludes that Dr. Stang's possession of a portion of that property is a trespass for purposes of AS 09.45.630.

<u>Remedies</u>

Being entitled to possession of the Dickson allotment, Ms. Bahnke is entitled to damages for the withholding of that property from her. Steve Dickson died February 18, 2007. Ms. Bahnke, as his devisee, was entitled to possession of the property thereafter. However, an action for damages for trespass upon real property must be commenced within six years. AS 09.10.050. This action was commenced October 1, 2013.[37] Therefore, trespass damages in this case may not be recovered for time prior to October 1, 2007.

The parties have stipulated that the value of the Dickson allotment is $20,305.00;[38] and Dr. Stang does not contest plaintiff's contention that the rental value of the portion of the Native allotment occupied by him is $1,015.25 per year.[39] Dr. Stang contends, however, that even if he is found to be in trespass, damages should begin to accrue in 2013. Dr. Stang argues that even if he did not own a portion of the Dickson allotment, he was there with Dickson's permission. This argument fails because Dickson's permission for Dr. Stang to occupy a portion of the Native allotment expired with Dickson. There is no evidence that Ms. Bahnke ever consented to Dr. Stang's possession of a portion of the Dickson allotment.

---

[37]Complaint, Docket No. 1.

[38]Memorandum in Support of Motion for Summary Judgment, Docket No. 23-8.

[39]Opposition to Motion for Summary Judgment (page 24 of 26), Docket No. 34.

Plaintiff, for the benefit of Ms. Bahnke, is entitled to trespass damages in the amount of $1,015.25 per year for seven years, October 1, 2007, through September 30, 2014, a total of $7,106.75. Ms. Bahnke is entitled to pre-judgment interest on the unpaid rental value of the Dickson allotment. Plaintiff computes interest through September 30, 2014, at $544.89. Defendant has not questioned that computation.

Plaintiff seeks a permanent injunction barring Dr. Stang from the allotment which now belongs to Ms. Bahnke. It is not clear to the court that injunctive relief is necessary nor an appropriate remedy for Dr. Stang's trespass upon the Dickson allotment. Subject to what follows, and unless the parties agree otherwise, the court is prepared to enter a judgment ejecting Dr. Stang from the Dickson allotment and requiring that he remove from that property all movable improvements that he has placed on the property.

This litigation will bring to an end a very long and mutually beneficial relationship that existed between Steve Dickson and others and Dr. Stang. They were neighbors and friends for some 35 years. Their relationship and their management of real and personal property was a throwback to times long past. The Dickson-Stang relationship was not "by the book," but it was plainly mutually beneficial. There is no suggestion that Dr. Stang ever took advantage of Steve Dickson. Dr. Stang probably paid Steve Dickson at least the fair value for a portion of the allotment.

There is a need, and Ms. Bahnke has every right, to have the ownership and possessory rights with respect to what is now her Native allotment clarified and put on a proper legal footing. But the court wonders if it is to everyone's benefit to put Dr. Stang to the expense of removing the improvements which he placed on the Native allotment – some of them 35 years ago – as opposed to entering into a proper, BIA-approved, purchase or lease arrangement for an appropriate portion of the allotment. The court encourages the parties to engage in a private mediation or to request the assistance of a judicial officer of this court for purposes of a settlement conference.

The court will shortly enter a partial judgment for trespass damages and interest through September 30, 2014.

DATED this  25th  day of March, 2015.

/s/ H. Russel Holland
United States District Judge